68521. WILLIS et al. v. FARMERS FERTILIZER & MILLING COMPANY, INC.
(323 SE2d 829)

McMURRAY, Chief Judge.

This is an appeal from a judgment of the Superior Court of Colquitt County, entered on December 19, 1983, in which the court construed a certain contract between the parties adversely to the contentions of the defendants. On January 8, 1983, plaintiff Farmers Fertilizer & Milling Company, Inc. (Farmers Fertilizer) entered into a contract with defendants Michael L. Willis, William R. Willis, Rayford Willis and Patricia Willis for the purchase and sale of both "quota farmer stock peanuts" and "additional peanuts." The contract consists of two separately executed documents which the parties stipulate were executed at the same time and are part and parcel of the same transaction. The first document of the contract consists of three pages and is captioned "CONTRACT FOR PURCHASE AND SALE OF FARMER STOCK PEANUTS (QUOTA)." The second document of the contract consists of two pages and is captioned "HANDLER CONTRACT WITH PRODUCERS FOR PURCHASE OF ADDITIONAL PEANUTS FOR CRUSHING OR EXPORT."

In accordance with the terms of the first contract document, the Willises delivered to Farmers Fertilizer all of their "quota peanuts." However, feeling that the first and second contract documents, construed together, gave to them a right to negotiate with and to sell and deliver their "additional peanuts" to third parties, the Willises refused to deliver the "additional peanuts" to Farmers Fertilizer. Accordingly, Farmers Fertilizer, on September 26, 1983, brought this action for specific performance and declaratory and injunctive relief against the Willises. In its complaint, plaintiff petitioned the court, inter alia, to require "Defendants to specifically perform their obligations to sell and deliver [the additional] peanuts to Farmers Fertilizer in accordance with the terms and conditions of the Contract"; to declare "that Defendants have no right or option to place and deliver certain [additional] peanuts covered by the Contract under the United States Department of Agriculture peanut price support loan program"; to "issue a temporary restraining order, and thereafter a preliminary and permanent injunction, restraining and enjoining Defendants from: (a) delivering to GFA Peanut Association for placement under the peanut price support loan program the [additional] peanuts which are to be delivered to Farmers Fertilizer under the Contract; (b) delivering, tendering or selling to any purchaser other than Farmers Fertilizer the peanuts which are to be delivered to Farmers Fertilizer under the Contract; and (c) handling or disposing of the peanuts which are to be delivered to Farmers Fertilizer under the Contract other than in accordance with the terms of the Contract or in such a way as to deprive Farmers Fertilizer of the delivery thereof."

The same day as the plaintiff filed its complaint, the trial court issued a temporary restraining order requiring defendants "to deliver to Farmers Fertilizer . . . [207,660 pounds of] the Segregation 1 [additional] peanuts as provided in the Contracts with Plaintiff under Paragraph 2 — Peanuts to be Delivered." In accordance with this order, defendants delivered to plaintiff the "additional peanuts" required, and plaintiff made bond in the equivalent of a certain price per ton for all peanuts delivered by the defendants.

Subsequently, on October 17, 1983, the defendants answered the complaint, denying the material allegations thereof. Additionally, defendants counterclaimed, asserting the contract in question gave to them the right to negotiate with and to sell and deliver their "additional peanuts" to third parties.

Thereafter, "[b]y stipulation of counsel, it was agreed that the court should determine the meaning of the contract of the parties from the four corners of the agreement and by applying the rules of construction. Argument on the correct interpretation was held on November 17, 1983. No evidence was presented at the hearing, but the

court did have available certain stipulations of the parties . . . in addition to admissions made in the pleadings." Both parties also specifically agreed that defendants did not waive their right to a jury trial as to any ambiguities that may have been found to remain in the contract by the court after applying the rules of construction.

Based on the trial court's interpretation of the agreement, the court held in favor of the plaintiff and against the defendants. The contentions of the defendants were specifically rejected, and the defendants were ordered to deliver the "additional peanuts" in question to the plaintiff. It is from this order that defendants appeal. *Held*:

1. In their enumerations of error, defendants contend that the trial court erred in ruling that the contract between the parties had the meaning ascribed to it by the plaintiff; that the findings of the trial court were not in conformity with the usual rules of construction; and alternatively, that the trial court erred in ruling that the contract was unambiguous as a matter of law; and, to this end, defendants contend that the ambiguity of the agreement requires resolution by a jury. We disagree.

A. "Where no matter of fact is involved, the construction of a plain and definite contract, if needed, is a matter of law for the court. But a contract is not ambiguous, even where difficult to construe . . . unless and until an application of the pertinent rules of interpretation leaves it uncertain as to which of two or more possible meanings represents the true intention of the parties. [Cit.] However, no construction is required or even permissible when the language employed by the parties in the contract is plain, unambiguous and capable of only one reasonable interpretation. [Cit.]" *Crooks v. Crim*, 159 Ga. App. 745, 748 (285 SE2d 84). " 'The cardinal rule of construction is to ascertain the intention of the parties. If that intention be clear, and it contravenes no rule of law, and sufficient words be used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction.' Code § 20-702 [now OCGA § 13-2-3]. The language used by the parties is of primary consideration. [Cits.] 'The intention of the parties is determined from a consideration of the entire contract.' [Cit.]" *Romine, Inc. v. Savannah Steel Co.*, 117 Ga. App. 353 (1) (160 SE2d 659).

Applying the foregoing rules of construction, we find no ambiguity in the instant contract. Further, we are of the opinion that the trial court's findings were in conformity with the usual rules of construction and that its construction of the contract in favor of the plaintiff was proper. To explain, we now examine the pertinent portions of the contract of which the defendants complain.

B. The first contract document entitled "CONTRACT FOR PURCHASE AND SALE OF FARMERS STOCK PEANUTS (QUOTA)" provides, in paragraph one, that "Seller agrees to produce

on the Farm [defined as farm serial number 46045] . . ., sell and deliver to Buyer, *103,830* pounds of quota farmers stock *Runner* (Type) Segregation 1 peanuts produced on the Farm during the [1983] crop year . . ., all of which shall be delivered at [Farmers Fertilizer's buying point in Lenox, Georgia] immediately after harvest . . ." In Paragraph 3, the contract provides that *"Seller . . . gives Buyer a right of first refusal* with respect to the purchase of all or any portion of the farmers stock Segregation 1 peanuts produced on the Farm for the Crop Year *which are not subject to the purchase and sale* pursuant to paragraph 1 hereof [i.e., "quota peanuts"] or *pursuant to prior sales specified in paragraph 9 hereof.* Seller shall not sell any such peanuts to a party other than Buyer without first offering such peanuts to Buyer at a price not greater and upon terms and conditions not less favorable [than] the price and terms and conditions offered in good faith by such other party for such peanuts . . ." (Emphasis supplied.) In Paragraph 9, the contract further provides that *"[o]ther than sales or contracts for sale with Buyer,* Seller warrants that it has not made, and agrees that it will not hereafter make, any sales or contracts for sale of any farmers stock Segregation 1 peanuts to be produced on the Farm for the [1983] Crop Year . . . either (i) which have been or are to be filled prior to the sale and delivery to Buyer of the full quantity of Contract Quota Peanuts specified in paragraph 1 above or (ii) to which the Buyer's right of first refusal under paragraph 3 above is subject, except as follows (IF NONE, SO STATE): [NONE]." (Emphasis supplied.) Defendants contend that the right of first refusal set forth in paragraph 3 of the "Quota Contract" gives them the right to seek other bidders on all peanuts in excess of the quota amount. In other words, defendants argue that since no prior sales are specified in paragraph 9 of the contract, they have the right under paragraph 3 to seek other bidders on the 254,460 pounds of Segregation 1 "additional peanuts" (subject to plaintiff's "right of first refusal"). We disagree.

First, it is noted that at the same time the "CONTRACT FOR PURCHASE AND SALE OF FARMERS STOCK PEANUTS (QUOTA)" was executed between the parties, the plaintiff-buyer entered into a "HANDLER CONTRACT" with the defendants-seller for the purchase of 254,460 pounds of Segregation 1 "additional peanuts." The fact that this "HANDLER CONTRACT" was not specified in paragraph 9 of the "Quota Contract" is no reason for the "right of first refusal" to apply to the "additional peanuts." The purpose of paragraph 9 is to furnish the buyer (plaintiff) with notice of sales or contracts for sales that a seller (defendants) may have with persons other than the buyer; obviously, the buyer needs no notice of its own contract with the seller. Further, it is clear from the above simultaneous transaction, that the parties intended to and did con-

tract to dispose of the 254,460 pounds of "additional peanuts" as provided for in the "HANDLER CONTRACT." It would be absurd to say that the buyer intended to receive a "right of first refusal" as to these 254,460 pounds of "additional peanuts" when it specifically contracted for the way in which it wanted to buy them. Moreover, the only reason a buyer would want a right of first refusal would be to assure that it was adequately protected in sellers' dealings with third parties for any peanuts that it did not already have a contract on. It would be unnecessary for a buyer to have a right of first refusal as to certain peanuts when it had already protected itself by contracting with the seller for these peanuts. Accordingly, the trial court was correct in rejecting the defendants' contentions "that the contract should be interpreted to mean that the entire 254,460 pounds of 'additional peanuts' is subject to the . . . right to seek other bids set forth in paragraph 3 [Right of First Refusal] of the 'Contract for Purchase and Sale.'"

C. The second contract document entitled "HANDLER CONTRACT WITH PRODUCERS FOR PURCHASE OF *ADDITIONAL PEANUTS* FOR CRUSHING OR EXPORT" provides in paragraph 2, in pertinent part, that "Producer agrees to deliver *254,460* pounds of Segregation 1 ☒ . . . peanuts . . . to the Handler at a price which shall be *Item 5* [note that the words "Item 5" were placed upon the contract by hand] percent of the quota support rate as shown on Form ASCS-1007, Inspection Certificate and Sales Memorandum, representing such peanuts: Provided, however, . . . The producer reserves the right to: . . . (ii) At time of harvest, negotiate with the handler a price higher than that specified above, or deliver such peanuts under the terms specified by this contract, or place such peanuts under loan at the additional price support level."

Defendants contend that "Paragraph 2 (c) (ii) . . . is operative on 254,460 pounds of peanuts and gave to the Appellants [Defendants] the right specified therein (1) to negotiate [in good faith] with the handler a higher price; and (2) to place such peanuts under any loan program available." However, the provisions of 2 (c) (ii) standing alone without reference to the entire contract make no sense. By considering Paragraph 2 (c) (ii) with Paragraph 5 (c), the uncertainty disappears. Indeed, paragraph 2 itself refers the parties to "Item 5" to determine price. Paragraph 5 (c) of the "OTHER PROVISIONS" section of the contract provides that "[t]he producer agrees to deliver *46,800* pounds of Segregation 1 peanuts after delivery of (1) farm poundage quota, (2) the poundage specified in (a) and (3) the poundage specified in (b) at a price of *37* percent of the quota support rate shown on Form ASCS-1007, Inspection Certificate and Sales Memorandum, representing such peanuts: *except that, at time of harvest, the producer reserves the right under option 2c (ii) to negotiate with*

*the handler a price higher than that specified in this paragraph, or deliver such peanuts under the terms specified by this contract, or place such peanuts under loan at the additional price support level.*" (Emphasis supplied.) Thus, with respect to 46,800 pounds of Segregation 1 "additional peanuts," the trial court was correct in finding "[t]hat the defendants intended to and did contract to deliver to plaintiff 46,800 pounds of additional peanuts; subject, however, to the price being negotiated as provided in paragraph 5 (c) of the contract. The price to be paid by plaintiff for the 46,800 pounds of peanuts to not be less than 37 percent of the quota support rate as established by the U. S. Department of Agriculture." However, as to the remaining 207,660 pounds of "additional peanuts," paragraph 5 (b) under the "OTHER PROVISIONS" section of the contract controls. Under this paragraph, "The producer agrees to deliver *207,660* pounds of Segregation 1 peanuts after delivery of quantity specified in (a) and after delivery to meet his farm poundage quota, at a price which shall be *59* percent of the quota support rate shown on ASCS-1007, Inspection Certificate and Sales Memorandum, representing such peanuts." Thus, with respect to these 207,660 pounds of "additional peanuts," no reservations under 2 (c) (ii) were made and as such the trial court was correct in finding "[t]hat the defendants intended to and did contract to deliver to plaintiff 207,660 pounds of 'additional peanuts' at the price of 59 percent of the quota support rate as established by the U. S. Department of Agriculture."

2. Based on the foregoing rationale and our examination of the entire record, we are of the opinion that the defendants' enumerations are without merit.

*Judgment affirmed. Deen, P. J., and Sognier, J., concur.*

DECIDED OCTOBER 9, 1984 —
REHEARING DENIED NOVEMBER 16, 1984 ▮▮▮▮▮▮

*F. Kennedy Hall, Ralph F. Simpson,* for appellants.
*Billy G. Fallin, Tom W. Thomas,* for appellee.